[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15001
_____

D.C. Docket No. 1:15-cr-20106-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

PATRICK KILLEN, JR.,
a.k.a. rebeccatill05,
a.k.a. beverlyhills05,
a.k.a. chanelizzabel,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 29, 2018)

Before MARTIN, JORDAN, and WALKER,[*] Circuit Judges.

MARTIN, Circuit Judge:

Patrick Killen, Jr. appeals his convictions and 139-year sentence relating to his possession, production, and distribution of child pornography. After careful consideration, and with the benefit of oral argument, we affirm Mr. Killen's convictions but vacate his sentence and remand for resentencing.

## I.    BACKGROUND

In 2013, when Mr. Killen was nineteen, he began posing as a young girl on Kik, which is a messaging-based mobile-phone application. Using the names "Rebecca Till" or "Chanel Izzabel," Mr. Killen began online conversations with teenage boys. He sent the boys images of a partially dressed young girl and asked the boys to send him nude photos of themselves in return. The boys agreed and sent photos of themselves, standing naked before a mirror, with their faces and genitalia visible. After agreeing to the initial requests, some of the boys tried to end their contact with Mr. Killen. Mr. Killen in turn threatened these boys that he would post their nude photos on social media platforms, like Instagram, unless they continued to send him more nude photos. The threatened boys complied. Sometimes, Mr. Killen directed the boys to assume particular poses. Mr. Killen

---

[*] Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

distributed these photos to another Kik user, "Vanyher." He also came to possess a lot of child pornography—over 2,000 images and 100 videos—on his personal electronic devices.

Law-enforcement offices, including the Federal Bureau of Investigation, began getting complaints about someone using Mr. Killen's usernames in 2013. One of these complaints led the FBI to Mr. Killen's residence in Hialeah, Florida. On February 11, 2014, Special Agents Laura Schwartzenberger and Jason Ginther interviewed Mr. Killen at his home. During the interview, Mr. Killen admitted to being "Rebecca Till" and asking boys ages fourteen or fifteen to send him nude images. He also consented to the search of his electronic devices.

Mr. Killen was arrested over a year later. A superseding indictment charged him with the following: coercing or employing a minor for the purpose of producing child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 1, 3, 5); distribution and receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Counts 2, 7–11); extortion by interstate threats, in violation of 18 U.S.C. § 875(d) (Counts 4, 6); possession of child pornography involving a visual depiction of a prepubescent minor younger than 12, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Counts 12, 15); possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Counts 13, 16); and destruction of evidence, in violation of 18 U.S.C. § 1519 (Count 14).

Before trial, Mr. Killen filed a motion to suppress his February 2014 confession as well as the search of his electronic devices. After a suppression hearing, the Magistrate Judge issued a report and recommendation ("R&R") recommending the motion be denied. The R&R was then adopted in full by the District Court. After a 5-day trial, a jury convicted Mr. Killen on all counts except for Count 14, which related to the destruction of evidence. The District Court sentenced Mr. Killen to 139-years imprisonment.

On appeal Mr. Killen challenges the District Court's denial of his suppression motion, the sufficiency of the superseding indictment, the admission and exclusion of certain evidence, and the sufficiency of the evidence to sustain his conviction on certain counts. He also argues that his sentence is procedurally and substantively unreasonable, and that it violates the Eighth Amendment.

## II.    CHALLENGES TO CONVICTIONS

A.    MOTION TO SUPPRESS

Mr. Killen argues that his February 2014 interview was custodial in nature, so he should have been informed of his constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436, 492, 86 S. Ct. 1602, 1637 (1966). He also argues that even if the interview was noncustodial, his confession was not voluntary. Finally, as to the search, he argues that his consent to the search of his electronic devices was not voluntary. For purposes of the appeal, Mr. Killen does not challenge the facts

4

found by the Magistrate Judge and adopted by the District Court, but rather questions the legal conclusions. We briefly recount the facts here.

The Magistrate Judge found the FBI agents went to the house, where Mr. Killen lived with his parents and younger sister, with the specific purpose of conducting a consensual interview and search. The agents suspected that, of the household residents, Mr. Killen was the most likely user of Kik. The agents first told Mr. Killen that they were investigating a North Carolina complaint about internet crimes, but did not reveal that he was a suspect. After asking some background questions, the agents asked Mr. Killen if he was "Rebecca Till," which he denied. Mr. Killen then told the agents they could search his electronic devices, and he left the room by himself to get the devices from his bedroom. Mr. Killen returned with his iPad and laptop computer. He told the agents his iPhone needed to be charged and went back to his bedroom at least twice, unaccompanied, to check on its battery level. On his second or third visit to his room, Mr. Killen returned with his phone and Agent Schwartzenberger confirmed that the battery level was indeed low.

Around the same time, Mr. Killen's mother asked the agents why they were there, and the agents gave her the same general explanation they initially gave Mr. Killen. When speaking with Mr. Killen's mother, however, Agent Schwartzenberger added that the FBI sometimes conducts investigations like these

5

using SWAT teams "and the whole neighborhood knows about it," but that she and Agent Ginther "were trying to be low-key." Mr. Killen's mother then told Mr. Killen "to give the agents what they want." Agent Schwartzenberger next asked Mr. Killen to fill out a consent form regarding his electronic devices. Among the other findings of the Magistrate Judge were that Mr. Killen was "very immature for his age" and that "he may experience some social or interpersonal deficits"[1]; that no one read the form to Mr. Killen; that Mr. Killen had time to read it; and that Mr. Killen signed the form.

While Agent Ginther examined Mr. Killen's electronic devices, Agent Schwartzenberger asked Mr. Killen again if he was "Rebecca Till." Mr. Killen asked Agent Schwartzenberger to speak with him outside privately, where he confessed to being Rebecca Till and to asking for and receiving nude photos from teenage boys. During this conversation, in response to Mr. Killen's concern that his parents would kick him out and mindful of the risk of suicide in cases like these, Agent Schwartzenberger reassured Mr. Killen that "he would be okay" and that "they were not there to arrest him."

Once back inside the house, Mr. Killen turned over two electronic-storage devices (USB or thumb drives), the agents returned Mr. Killen's iPad to him, and

---

[1] The Magistrate Judge also noted that Mr. Killen had completed high school, "was successfully taking courses at Miami Dade College[,] and [was] working."

the agents and Mr. Killen amended the consent form accordingly.  The agents then gave Mr. Killen a signed property receipt, which Mr. Killen also signed.  Agent Ginther then accompanied Mr. Killen to his room to search for an old cell phone. While they were gone, Agent Schwartzenberger told Mr. Killen's parents about their son's criminal conduct and advised them to get psychological help for him because there was a risk for suicide in cases like this one.  Agent Schwartzenberger gave the parents her business card, and the agents left.  Later that afternoon, Agent Schwartzenberger got an email from Mr. Killen's father saying he had scheduled a psychologist appointment for his son later that week.

The Magistrate Judge found that, although Mr. Killen and his parents felt the FBI agents' presence in their home to be intimidating, "[i]t was clear from the testimony of Defendant and his parents that they wanted to cooperate with the agents that morning."  The agents never displayed firearms or handcuffs.  Neither did they touch Mr. Killen or anyone else in the home nor tell them they could not leave.  Mr. Killen and his parents, in turn, never asked the agents to leave.

When reviewing the denial of a motion to suppress, "[w]e review the district court's findings of fact for clear error and construe the evidence in the light most favorable to the party prevailing below—here, the government.  We review the district court's interpretation and application of the law de novo."  United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007) (citation omitted).

7

"A person taken into custody must be advised of his right to remain silent and his right to counsel prior to any interrogation. . . . Even if a person has not been arrested, advice of <u>Miranda</u> rights is required if there is a restraint on freedom of movement of the degree associated with a formal arrest." <u>United States v. Muegge</u>, 225 F.3d 1267, 1269–70 (11th Cir. 2000) (per curiam) (quotation and citations omitted). "In order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable [<u>innocent</u>] man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." <u>Id.</u> at 1270 (quotation omitted and alteration adopted). A defendant's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, [does] not automatically create a custodial situation." <u>Id.</u>

Even if we conclude an interview was noncustodial, we must still ensure that the confession was voluntary. <u>United States v. Lall</u>, 607 F.3d 1277, 1285 (11th Cir. 2010). To determine whether a confession "was the product of an essentially free and unconstrained choice," we consider the totality of the circumstances. <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252–53 (11th Cir. 2003) (quotation omitted). We evaluate factors such as "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him,

8

or the use of any promises or inducements by police." Id. at 1253. The presence or absence of a factor will not necessarily warrant a conclusion that the confession was involuntary. Id. A law-enforcement officer's promise not to prosecute or not to use a suspect's statement against him "may be the most significant factor in assessing the voluntariness of an accused's confession." Lall, 607 F.3d at 1286 (quoting United States v. Walton, 10 F.3d 1024, 1030 (3d Cir. 1993)).

Our Constitution permits a warrantless search that has been consented to. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973). Whether consent was freely given is "to be determined by the totality of the circumstances," which includes consideration of such factors as

> [(1)] voluntariness of the defendant's custodial status, [(2)] the presence of coercive police procedure, [(3)] the extent and level of the defendant's cooperation with police, [(4)] the defendant's awareness of his right to refuse to consent to the search, [(5)] the defendant's education and intelligence, and, significantly, [(6)] the defendant's belief that no incriminating evidence will be found.

United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989). No one factor is dispositive, including knowledge of the right to refuse consent. Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2048. The presence or absence of voluntary consent is a question of fact on which the government bears the burden of proof. Blake, 888 F.2d at 798. We thus review the district court's finding as to whether voluntary consent was given for clear error. Id.

9

Our review of the record and the governing law persuades us that the District Court properly denied Mr. Killen's motion to suppress.

Mr. Killen contends the FBI's interview was custodial because he was a young, immature man, living in his parents' home, and therefore did not feel free to leave, especially after his mother told him to give the agents what they wanted. In evaluating this argument we apply an objective test. See Muegge, 225 F.3d at 1270. All agree that this was an in-home, kitchen-table interview. The agents never arrested nor threatened Mr. Killen or his parents. Mr. Killen repeatedly left the room unescorted to get or check on electronic devices in his bedroom. This record leads us to conclude that Mr. Killen's interview was not custodial. See United States v. Phillips, 812 F.2d 1355, 1357, 1362 (11th Cir. 1987) (determining interview was noncustodial though suspect was interviewed at the police station, police had reason to believe suspect was engaged in criminal conduct, and suspect was never told he could leave).

Mr. Killen contends that his confession was nonetheless involuntary because (1) Agent Schwartzenberger's comment about using a SWAT team had the direct effect of having Mr. Killen's mother order him to give the agents what they wanted; (2) the FBI agents deliberately misled Mr. Killen and his parents by failing to disclose that Mr. Killen was their prime suspect; and (3) Mr. Killen was immature for his age. The agents did not threaten or use physical force against Mr.

Killen.  Indeed, the most "coercive" conduct Mr. Killen can identify is Agent

Schwartzenberger's comment about using a SWAT team.  Although perhaps not

salutary and also unnecessary, this isolated remark was not sufficiently coercive to

render Mr. Killen's confession involuntary.  See United States v. Jones, 32 F.3d

1512, 1517 (11th Cir. 1994) (per curiam) ("Sufficiently coercive conduct normally

involves subjecting the accused to an exhaustingly long interrogation, the

application of physical force or the threat to do so, or the making of a promise that

induces a confession." (quotation omitted)).  As to the allegation that the agents

misled Mr. Killen, we observe that Mr. Killen knew the exact nature of the FBI's

investigation once Agent Schwartzenberger asked him if he was Rebecca Till.

This revelation came before Mr. Killen made his confession.  Even if we accept

that the agents' failure to inform Mr. Killen and his parents that he was a prime

suspect from the outset amounted to "deceit," Mr. Killen does not explain how this

deception coerced or induced him into making a confession, or contained false

promises not to prosecute or not to use his statements against him.  See Lall, 607

F.3d at 1283–84.  Finally, in light of the lack of any coercive police activity, Mr.

Killen's immaturity is not enough to render his confession involuntary.  See

Singleton v. Thigpen, 847 F.2d 668, 671 (11th Cir.1988) ("[C]oercive police

activity is a necessary predicate to a finding that the confession by a person with a

low intelligence level is involuntary." (quotation omitted)).  Considering the totality of the circumstances, we conclude Mr. Killen's confession was voluntary.

Finally, Mr. Killen challenges the search of his electronic devices by saying that, in light of his immaturity and the fact he did not know he could refuse the agent's request, his consent was not voluntary.  Again, Mr. Killen was not in custody and he was cooperative with agents from the beginning of their visit.  Also, the isolated comment about SWAT teams was not sufficiently coercive under circuit precedent.  We accept the Magistrate Judge's findings that Mr. Killen is immature and possesses some social and interpersonal deficits, together with the fact that Mr. Killen failed to read the consent form.  Although each of these facts weighs on the voluntariness of Mr. Killen's consent, none is dispositive.  See Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2048.  In the end, the Magistrate Judge's finding that Mr. Killen gave voluntary consent was not clearly erroneous.  See Blake, 888 F.2d at 798.

On this record, the District Court did not err in denying the motion to suppress.

B.    SUFFICIENCY OF THE INDICTMENT

Mr. Killen argues that the extortion counts, Counts 4 and 6, have an additional mens rea requirement that the government failed to charge and prove,

and thus his convictions on these counts must be vacated.  Counts 4 and 6 charged

violations of 18 U.S.C. § 875(d):

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

Id. § 875(d).

In Elonis v. United States, 575 U.S. ___, 135 S. Ct. 2001 (2015), the

Supreme Court vacated a conviction under 18 U.S.C. § 875(c) involving the

interstate transmission of threats to kidnap or injure a person.[2]  Elonis, 135 S. Ct. at

2012.  The Court determined that § 875(c) lacked an express mens rea requirement,

unlike its neighboring provisions § 875(b) and § 875(d).  Id. at 2008–09.  The trial

court's instruction to the jury, that the government needed to prove only that a

reasonable person would view a communication sent by the defendant as a threat,

therefore "reduce[d] culpability on [whether the communication contained a threat]

. . . to negligence."  Id. at 2007, 2011 (quotation omitted).  The Court rejected this

notion because "wrongdoing must be conscious to be criminal."  Id. at 2012

---

[2] Section 875(c) states, "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."  18 U.S.C. § 875(c).

13

(quotation omitted).  Nonetheless, the Court reasoned it could read the necessary mens rea into the statute, which it defined as "only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct."  Id. at 2010 (quotation omitted).  The Court determined that "the crucial element separating legal innocence from wrongful conduct" under § 875(c) was "the threatening nature of the communication" and thus culpability required consideration of the defendant's state of mind as to that element.  Id. at 2011 (quotation omitted).

Mr. Killen's argument extrapolates from Elonis that § 875(d) also requires "a subjective intent to convey a threat to injure another" or some awareness by the defendant that the communication contains a threat.  In other words, he argues that the government was required to charge and prove that he had some awareness that telling the teenage boys he would post their nude photos on social media platforms would be perceived as a threat by the boys.  Generally, whether the government is required to allege and prove a particular element of a crime is a question of law subject to de novo review.  United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999) (per curiam).  However, since Mr. Killen never made this objection to the indictment, we must review for plain error only.  See Fed. R. Crim. P. 52(b); United States v. Swatzie, 228 F.3d 1278, 1281 (11th Cir. 2000).  "The plain-error test has four prongs: there must be (1) an error (2) that is plain and (3) that has

14

affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Madden, 733 F.3d 1314, 1320 (11th Cir. 2013) (alteration adopted and quotation omitted).

There was no error here, plain or otherwise. First, unlike § 875(c), § 875(d) already contains a required mental state: "intent to extort." Id. § 875(d). Second, the Supreme Court's core concern in Elonis, that a person can violate § 875(c) without being aware of their own wrongdoing, does not apply to convictions under § 875(d). See Elonis, 135 S. Ct. at 2011–12; see also United States v. Jackson, 180 F.3d 55, 70 (2d Cir. 1999) (concluding that "Congress meant to adopt the traditional concept of extortion [in § 875(d)], which includes an element of wrongfulness"). In order to prove "intent to extort," the government must prove that the defendant had the intent to procure something of value through wrongful conduct. Cf. United States v. White, 810 F.3d 212, 223 (4th Cir. 2016) ("[T]he intent to extort for purposes of § 875(b) is the intent to procure something of value through the use of a wrongful threat to kidnap or injure the person of another. Such a threat is wrongful when delivered intentionally.").[3] Because "[e]xtortion

---

[3] Although the Fourth Circuit addressed § 875(b) in White, its reasoning also applies to § 875(d), which differs from § 875(b) only in the nature of the threat. Compare 18 U.S.C.

15

only works if the [victim] fears that not paying will invite an unsavory result," "to intend to extort one must necessarily intend to instill fear of harm." Id. at 223. In the context of § 875(d), therefore, "it would be passing strange, indeed impossible, for a defendant to intend to obtain something by communicating [] a threat [to injure the property or reputation of another or a threat to accuse another of a crime] without also intending, understanding, or, possibly, recklessly disregarding that the communication would be perceived as threatening." See id. We reject Mr. Killen's argument as to the sufficiency of the indictment.

## C.    EXPERT MENTAL HEALTH TESTIMONY

Mr. Killen contends that the District Court abused its discretion in excluding expert testimony about his mental state. On June 8, 2015, the government filed a motion in limine to exclude expert testimony of Mr. Killen's mental condition because (1) no notice had been given as required under Federal Rule of Criminal Procedure 12.2,[4] and (2) Mr. Killen was charged with only general-intent crimes. Mr. Killen did not respond to the government's motion, and the District Court granted it. The District Court's order relied primarily on the lack of notice, but

§ 875(b) (criminalizing threat to kidnap or injure the person of another), with id. § 875(d) (criminalizing threat to injure the property or reputation of another or threat to accuse another of a crime).

[4] Federal Rule of Criminal Procedure 12.2 requires defendants to give notice if they want to present expert evidence of a mental condition bearing on the issue of guilt. Fed. R. Crim. P. 12.2(b). Rule 12.2(d)(1)(A) authorizes district courts to exclude such evidence for failure to give notice.

16

alternatively adopted the government's argument that Mr. Killen was charged with only general-intent crimes. Mr. Killen then filed a motion for reconsideration, in which he offered an excuse for his delay in responding to the government's motion in limine—but not for failing to file a Rule 12.2 notice. He also argued he was charged with some specific-intent crimes. The District Court denied the motion for reconsideration. On appeal Mr. Killen challenged only the District Court's alternative ruling that he was charged with general-intent crimes.

A district court's decision on the admissibility of psychiatric evidence at trial is reviewed for an abuse of discretion. United States v. Cameron, 907 F.2d 1051, 1057 (11th Cir. 1990). "To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect." Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680 (11th Cir. 2014). Failure to challenge a particular ground results in its abandonment and "it follows that the judgment is due to be affirmed." Id.

In Mr. Killen's opening brief on appeal, like his motion for reconsideration, he challenged only the District Court's finding that he was charged with general-intent crimes. He failed again here to address the District Court's ruling that he did not give notice under Rule 12.2. On this record, Mr. Killen has waived any challenge to the District Court's dismissal on that ground, so "the judgment is due

17

to be affirmed." See id.  Our conclusion does not change because Mr. Killen

included argument on notice in his reply brief.  See id. at 682–83 (stating this

Court's rule that arguments not raised in opening briefs are deemed waived).

D.    CONFRONTATION CLAUSE

Mr. Killen argues the District Court twice violated his Confrontation Clause

rights.  He says the first violation happened when the District Court admitted law-

enforcement officers' testimony about victim reports and allowed parents of the

victim boys to testify.  Mr. Killen characterizes this testimony as testimonial

hearsay statements from the victims.  Mr. Killen says the second Confrontation

Clause violation happened when the District Court admitted business records from

Kik because they were processed through Canadian law enforcement officers and

thus constituted testimonial hearsay.[5]

"We review evidentiary rulings for an abuse of discretion.  However, we

review de novo the question of whether hearsay statements are testimonial for

purposes of the Confrontation Clause."  United States v. Caraballo, 595 F.3d 1214,

1226 (11th Cir. 2010) (quotations and citations omitted).  "In all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the

---

[5] Mr. Killen also argues that Kik's record custodian should have testified at trial and the government's use of an out-of-court statement certifying that the records were kept in the ordinary course of business presented a Confrontation Clause problem.  This argument is waived as it was raised for the first time in Mr. Killen's reply brief.  See Sapuppo, 739 F.3d at 682–83.

18

witnesses against him." U.S. Const. Amend. VI. The Confrontation Clause is concerned with a specific type of hearsay—testimonial statements, or "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." Crawford v. Washington, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364 (2004) (quotations omitted). Therefore, the Confrontation Clause does not bar statements that are not hearsay or statements that are nontestimonial in nature. See Davis v. Washington, 547 U.S. 813, 821–22, 126 S. Ct. 2266, 2273–74 (2006) (holding the Confrontation Clause is not concerned with nontestimonial hearsay); United States v. Jiminez, 564 F.3d 1280, 1287 (11th Cir. 2009) (determining statements offered "for a purpose other than the truth of the matter asserted" do not implicate the Confrontation Clause). Out-of-court statements made to law-enforcement officers may be admitted as nonhearsay if they are offered to explain how the officers came to take the investigative actions they did. Jiminez, 564 F.3d at 1288. Also, private conversations between family members in the home are typically nontestimonial when they were "not made under examination, [were] not transcribed in a formal document, and [were] not made under circumstances leading an objective person to reasonably believe the statement would be available for use at a later trial." United States v. Brown, 441 F.3d 1330, 1360 (11th Cir. 2006).

19

The admission of the law-enforcement officers' and victims' parents' testimony did not violate the Confrontation Clause.  Of the government's witnesses, only two law-enforcement officers testified about the initial complaints they received from parents and a student about the boys' interactions with Mr. Killen's online identities.  The officers told of these complaints to show how the officers' investigation came about.  Thus, they were not offered for the truth of the matter asserted and did not implicate the Confrontation Clause.  See Jiminez, 564 F.3d at 1287–88.  Of the parents who testified, two did not convey any of their sons' out-of-court statements.  The third parent's testimony did include a hearsay statement from her son, to the extent she recounted how he told her about sending nude photos to a stranger.  However, this hearsay statement did not implicate the Confrontation Clause because it was nontestimonial.  The boy made the statement to his mother soon after his interaction with Mr. Killen, in private, in their home, to explain his distress and to seek reassurance and forgiveness from his mother.  These circumstances would not lead an objective person to reasonably believe the statement was testimonial in that it would be available for use at a later trial.[6]  See Crawford, 541 U.S. at 51–52, 124 S. Ct. at 1364; Brown, 441 F.3d at 1360.

---

[6] The parties do not argue and we do not decide whether the admission of this boy's statement violated the evidentiary rule against hearsay.  See Fed. R. Evid. 802.

As for the Kik business records, it is generally true that business records "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial [] are not testimonial" and pose no Confrontation Clause problem. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324, 129 S. Ct. 2527, 2539–40 (2009). Mr. Killen argues, however, that since the Kik records were processed by Canadian law enforcement, they were created for the purpose of his prosecution.[7] The record supports this argument. A government witness testified at trial that Canadian police had encrypted and inventoried the Kik records and provided an index. However, the witness did not know whether the Canadian police had exercised any discretion in passing along the records. No Canadian officer was called to testify to the nature of the processing done by Canadian law enforcement, so the record does not reveal to us whether encrypting, inventorying, and generating an index were the only actions taken with regard to the Kik records.

However, we need not decide whether this type of action by law-enforcement agencies can rise to a Confrontation Clause violation. Even if we

---

[7] Kik is a Canadian company, and the FBI requested the records through the Mutual Legal Assistance Treaty ("MLAT"). Kik turned them over to the Royal Canadian Mounted Police, who in turn gave them to the FBI. These records consisted of transactional and identifying information, such as chat logs identifying one user as talking to another user at a particular time; photographs sent over the service; bind logs identifying when a particular user accesses Kik; and identifying account information such as location, usernames, associated email accounts, and IP addresses. The records did not include the content of Mr. Killen's text messages shared on Kik.

assume that the admission of the Kik records was a Confrontation Clause violation, it was harmless beyond a reasonable doubt in this case. See United States v. Caraballo, 595 F.3d 1214, 1229 n.1 (11th Cir. 2010) ("For violations of the Confrontation Clause, harmless error occurs where it is clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (quotation omitted)). Simply put, there was other overwhelming evidence of Mr. Killen's guilt on the offenses of conviction. FBI Agent Melissa Starman testified about the evidence recovered from Mr. Killen's personal electronic devices, including: saved conversations between Mr. Killen and the victims; saved conversations between Mr. Killen and other internet users interested in child pornography; photographs and videos containing child pornography; use of file-sharing software; and incriminating internet searches. Agent Schwartzenberger testified about Mr. Killen's confession during the February 2014 interview. And Mr. Killen himself testified and admitted to soliciting child pornography and to the extortion conduct. Mr. Killen also confirmed that Agent Schwartzenberger's testimony about what he said in his confession was "essentially" correct. In light of this other evidence, even if a Confrontation Clause violation resulted from admission of the Kik business records, it did not materially contribute to the verdict returned by the jury.

22

E.    SUFFICIENCY OF THE EVIDENCE

Mr. Killen raises two challenges based on sufficiency of the evidence.  He first argues that the evidence was not sufficient to convict him of the extortion counts, Counts 4 and 6, because the extortion victims did not testify.  He also argues that the nude images sent by his victims do not meet the definition of child pornography in 18 U.S.C. § 2256(2)(A) and thus require reversal of his convictions on Counts 1–3, 5, and 7.

Sufficiency of the evidence challenges are reviewed de novo, with the evidence viewed in the light most favorable to the government and with all reasonable inferences and credibility choices made in the government's favor. United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011).

For the extortion counts, a government agent testified about saved conversations recovered from Mr. Killen's personal electronic devices, during which Mr. Killen asked teenage boys for photos; was refused; then threatened he would post the nude photos he had already received on social media platforms if more were not sent.  In any event, Mr. Killen admitted to the extortion conduct and the feeling of power and control it gave him.  This record contains sufficient evidence on these counts to permit a jury to find guilt beyond a reasonable doubt without testimony from the victims.

23

On the question of whether the nude images of the teenage boys constitute child pornography as defined in 18 U.S.C. § 2256(2)(A), we conclude they do. Child pornography is defined as "any visual depiction" of "a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(B). Section 2256(2)(A) defines "sexually explicit conduct" as including the "lascivious exhibition of the genitals or pubic area of any person." Id. § 2256(2)(A)(v). "[A] lascivious exhibition [is] one that potentially excites sexual desires or is salacious." United States v. Grzybowicz, 747 F.3d 1296, 1305–06 (11th Cir. 2014) (quotation omitted and alterations adopted). "[D]epictions of otherwise innocent conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction." United States v. Holmes, 814 F.3d 1246, 1251–52 (11th Cir. 2016). "Lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles." Id. at 1252 (alteration adopted) (quoting United States v. Wiegand, 812 F.2d 1239, 1244 (9th Cir. 1987)).

Mr. Killen contends that these nude images are simply nude images—innocent conduct of teenage boys. But to the contrary, the electronic evidence of the conversations shows that Mr. Killen insisted the boys be photographed with an erect penis and that he rejected pictures that did not contain this feature. Mr.

24

Killen also directed the boys into particular poses to show their testicles and display the length of their erect penis. Mr. Killen's conversations with the teenage boys were also sexual in nature. When he shared the images with others, Mr. Killen would describe them in sexual terms. Mr. Killen also possessed other images of child pornography that had been shared with him through file- sharing websites. See United States v. Smith, 459 F.3d 1276, 1296 n.17 (11th Cir. 2006) ("That the photographs of the victim were found with other sexually explicit photographs could make it more likely that their purpose was to elicit a sexual response."). We recognize that Mr. Killen denied sexual gratification from these images, but we have held that "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt" meaning that "the jury might conclude that the opposite of his testimony is true." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (emphasis omitted). Again here, there was sufficient evidence for a reasonable jury to find that the nude photographs were "lascivious exhibition[s] of the genitals or pubic area." 18 U.S.C. § 2256(2)(A)(v).

On this record, we affirm Mr. Killen's convictions.

### III.    CHALLENGES TO SENTENCE

With regard to his sentence, Mr. Killen argues that 139 years is both procedurally and substantively unreasonable. We review the reasonableness of a

sentence for abuse of discretion.  Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).  We first look to whether the sentence is procedurally unreasonable.  We ask whether the district court committed any "significant procedural error, such as . . . improperly calculating[] the [United States Sentencing] Guidelines range, treating the Guidelines as mandatory, [or] failing to consider the [18 U.S.C.] § 3553(a) factors."[8]  Id.  If the sentence is procedurally sound, we then determine whether it is substantively reasonable, "tak[ing] into account the totality of the circumstances."  Id.  "The party challenging the sentence bears the burden of showing that it is unreasonable."  United States v. Trailer, 827 F.3d 933, 936 (11th Cir. 2016) (per curiam).  We will vacate the sentence only "if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Id. (quotation omitted).

Mr. Killen argues that his sentence is procedurally unreasonable because the District Court erred when it applied Guidelines § 2G2.1.  He contends that § 2G2.1

---

[8] The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

defines child pornography by reference to 18 U.S.C. § 2256(2)(A) and the nude images sent by the victims to Mr. Killen did not meet the definition of "sexually explicit conduct." But we have already addressed this contention and concluded there was sufficient evidence to support the jury's finding that these images were "lascivious exhibition[s]." Thus the District Court did not err in applying § 2G2.1. Mr. Killen also makes a general objection to the application of Guidelines §§ 2G2.1 and 2G2.2. He argues that these child pornography guidelines are not empirically based and that the Sentencing Commission's 2012 report criticizing them has essentially rendered them invalid. Although recognizing the report is something "a district court may certainly consider . . . in choosing the ultimate sentence," this Court has already rejected the argument that the 2012 report renders the guidelines invalid. See United States v. Cubero, 754 F.3d 888, 900 (11th Cir. 2014)[9]; see also United States v. Wayerski, 624 F.3d 1342, 1354–55 (11th Cir. 2010). Mr. Killen's last objection to the application of Guidelines § 2G2.1(d)(1), is that it resulted in an additional 252 "pseudo counts" related to minors not named in the indictment. He says the relevant conduct for any of his offenses of conviction does not support the application of § 2G2.1(d)(1). We need not decide whether the conduct related to unnamed victims was properly considered as

---

[9] The report was published in December 2012 and it was reported to Congress in February 2013. Cubero, 754 F.3d at 898. Cubero refers to it as the "2013 report."

27

relevant conduct for Mr. Killen's production offenses. Even without the pseudo counts, Mr. Killen's offense level would still have reached the maximum level of 43 and his guideline range would have been the same. See United States v. Sarras, 575 F.3d 1191, 1220 & n.39 (11th Cir. 2009) (reviewing a sentence for procedural reasonableness and noting that an alleged error was harmless because the total offense level would have remained the same). Mr. Killen's sentence did not result from procedural error.

However, our careful consideration has led us to conclude that his sentence is substantively unreasonable. In imposing what amounted to a life sentence without parole, the District Court responded to Mr. Killen's argument that his sentence was disparate by saying "sentencing disparity is not a recognized basis for a sentence to be imposed."[10] But to the contrary, § 3553(a) lists "the need to avoid unwarranted sentencing disparities" as a factor to be considered. 18 U.S.C. § 3553(a)(6). Indeed this factor requires particular attention in the context of child pornography offenses, in light of the wide range of conduct that can constitute this type of offense, as well as the breadth of sentences authorized under the child

---

[10] We take the District Court's sentencing-disparity remark as an indicator that it ignored this factor. See United States v. Pugh, 515 F.3d 1179, 1194 (11th Cir. 2008) ("[A] sentence may be unreasonable if it is grounded solely on one factor, relies on impermissible factors, or ignores relevant factors."). To the extent the District Court did not consider the 18 U.S.C. § 3553(a) factors altogether, the sentence is also procedurally unreasonable. See Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007) (explaining that "failing to consider the § 3553(a) factors" is a procedural error).

pornography guidelines.  See United States v. Kapordelis, 569 F.3d 1291, 1317 (11th Cir. 2009) (collecting cases).

The significance of considering sentencing disparity is highlighted by a comparison of the defendant's conduct in Kapordelis to that of Mr. Killen.  In Kapordelis, we affirmed Mr. Kapordelis's 35-year sentence, which was a variance above his guideline range, where he possessed more than 500 videos and 2,000 images of child pornography, had a 20-year history of drugging and molesting minors, and had traveled abroad to have sex with minor boys.  Id. at 1318–19.  Mr. Killen possessed a similar number of child pornography images.  However, in contrast to Mr. Kaprodelis, Mr. Killen had no hands-on contact with a minor during the less than 2-year period of his criminal conduct, let alone a 20-year history of drugging and molesting them or traveling for the express purpose of having sex with a child.  Also, there are potentially mitigating facts in Mr. Killen's case, not present in the Kapordelis case.  For example, despite the fact that Mr. Killen had reached the age of majority at the time of his offense, he was found to be very immature for his age.  The Magistrate Judge made this finding after the suppression hearing, and the District Court adopted it.  The District Court heard from both Mr. Killen's parents and a neighbor during sentencing that Mr. Killen was a "special needs" child.  The presentence report detailed his horrific childhood

29

in a Romanian orphanage.  And yet Mr. Killen's sentence is four times that of Mr. Kapordelis.

Thus, we conclude that the District Court did not consider "the need to avoid unwarranted sentencing disparities," 18 U.S.C. § 3553(a)(6), and we are left with the definite and firm conviction that the court committed a clear error of judgment in weighing the § 3553(a) factors.  See United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) ("A district court abuses its discretion when it [] fails to afford consideration to relevant factors that were due significant weight."); Pugh, 515 F.3d at 1194 ("[A] sentence may be unreasonable if it is grounded solely on one factor, relies on impermissible factors, or ignores relevant factors.").  We therefore vacate Mr. Killen's sentence.[11]

In remanding for resentencing, we note the District Court said at sentencing that it could not see any future for Mr. Killen other than incarceration.  The District Court clearly concluded that the only proper sentence for Mr. Killen would leave him to spend the rest of his life in prison.  In light of his remarks that notwithstanding any errors the sentence would be "identical as a reasonable sentence," we conclude that the judge who imposed this 139-year sentence will have "difficulty putting his previous views and findings aside."  United States v.

---

[11] Because we vacate Mr. Killen's sentence on grounds of substantive unreasonableness, we need not address his Eighth Amendment claims.

Torkington, 874 F.2d 1441, 1447 (11th Cir. 1998) (per curiam); see also United States v. Plate, 839 F.3d 950, 958 (11th Cir. 2016) (reassigning case to new district judge for resentencing where "it appear[ed] the district court may be unable to disregard its improper consideration of [a] factor or, at least, that it may appear so"). We also conclude that reassignment of Mr. Killen's sentencing will not entail significant waste or duplication. See Torkington, 874 F.2d at 1447. We therefore exercise our supervisory powers and remand Mr. Killen's case for resentencing before a different district court judge. See id.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**